**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AHTAESHA SMITH, | ) | Civil Action No. _____ |
| | ) | |
| *Plaintiff*, | ) | Filed Electronically |
| | ) | |
| vs. | ) | |
| | ) | |
| ELDERLY HOUSING DEVELOPMENT | ) | |
| AND OPERATIONS CORPORATION, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>COMPLAINT IN CIVIL ACTION</u>

Plaintiff, Ahtaesha Smith, by and through the undersigned counsel, files the following

Complaint in Civil Action against Defendant, Elderly Housing Development and Operations

Corporation, averring as follows:

## <u>THE PARTIES</u>

1.      Plaintiff, Ahtaesha Smith ("<u>Plaintiff</u>"), is an adult individual who at all times

relevant hereto was employed by Defendant in Pittsburgh, Pennsylvania.

2.      Defendant, Elderly Housing Development and Operations Corporation

("<u>Defendant</u>" or "<u>EHDOC</u>"), is a corporation with a registered address of 1200 South Pine Island

Road, Suite 300, Plantation, Florida 33324. Defendant's principal place of business is located at

the same address. Defendant operated two senior residential buildings in Pittsburgh, Pennsylvania,

at which Plaintiff reported to work on a regular basis (the "<u>Facility</u>").

## <u>JURISDICTION AND VENUE</u>

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

4.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "Western District") as a substantial part of the events and omissions giving rise to the Claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

5.      Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District.

6.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District Pursuant to LCvR 3.

**C.      This Court May Exercise Personal Jurisdiction Over Defendant.**

7.      This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

8.      Personal jurisdiction is proper over a defendant if the defendant is a registered Pennsylvania entity and has thus "consented" to the exercise of general personal jurisdiction pursuant to 42 Pa. C.S. § 5301. *Aetna Inc. v. Kurtzman Carson Consultants, LLC*, No. 18-470, 2019 BL 114021, at *5 (E.D. Pa. Mar. 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)).

9.      42 Pa. C.S. § 5301 states: "The existence of any of the following relationships

2

between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person." 42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.—
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth. 42 Pa. C.S. § 5301(a).

10.    As discussed above, Defendant conducts a continuous and systematic part of its general business within the Commonwealth of Pennsylvania, where it operates and maintains the Facility and employed Plaintiff. Accordingly, Defendant may properly be personally brought before this Court pursuant to 42 Pa. C.S. § 5301(a)(2).

**D.    Plaintiff Has Exhausted Her Administrative Remedies; Her Federal and State Law Claims are Properly Before This Court.**

11.    Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and may now proceed to bring this action before the Court. Specifically:

a.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Claims.

b.    The EEOC issued a Notice of Right to Sue, affording Plaintiff 90 days within which to timely file the Federal Law Claims and the State Law Claims.

c.    The instant Complaint is filed within the 90-day time period.

### FACTUAL BACKGROUND

12.    Plaintiff is a 39-year-old black female who began her employment with Defendant on or about October 2022 as a Property Manager responsible for overseeing two senior residential

buildings in Pittsburgh, Pennsylvania (the "Position").

13.     Plaintiff was hired on a full-time basis at an annual salary of $50,000, paid biweekly, and received a merit increase to a salary of $55,000 during her tenure with Defendant.

14.     Plaintiff's record during her nearly two years with Defendant was exemplary.

15.     She received consistently positive performance reviews, including a formal review conducted in 2023.

16.     She never received any disciplinary action during the entirety of her employment and routinely received praise from Defendant's personnel and the residents she encountered.

17.     At the inception of Plaintiff's tenure, she reported to Eunice (last name unknown) ("Eunice"), the regional property manager who was based in Maryland.

18.     Eunice was eventually replaced by Shaunte Gardner ("Gardner"), who became Plaintiff's direct supervisor.

19.     Plaintiff also reported to Melissa Tarrant ("Tarrant"), who served simultaneously as Defendant's Vice President of Field Operations, as a regional manager, and as a property manager of separate EHDOC buildings in the Pittsburgh area.

20.     Tarrant's layered authority, spanning from peer to apex supervisor within the same regional operation, created a substantial power imbalance.

21.     Tarrant used that authority to consistently protect and favor Caucasian employees.

22.     This dynamic was not limited to a single incident.

23.     Throughout Plaintiff's employment, Tarrant applied company policies and job requirements selectively.

24.     Black employees were held to the full weight of Defendant's rules and job demands while Caucasian employees, particularly those favored by Tarrant, were granted carve-outs and

4

exceptions that were never extended to their similarly situated black counterparts.

25.  For example, in 2025 Defendant circulated a directive requiring all property management sites to participate in a Flag Day/Juneteenth ceremony.

26.  The directive was clear: all sites were to organize the event, with each site's service coordinator expected to coordinate and participate.

27.  Plaintiff worked with her black service coordinator, Shereen McFadden, to prepare the event in compliance with the corporate mandate.

28.  However, Tarrant intervened and personally told Jennifer (last name unknown) ("Jennifer"), a Caucasian service coordinator at a separate EHDOC property, that she was not required to participate.

29.  The most direct and telling illustration of Tarrant's racial favoritism centered on Defendant's maintenance employee Steve Stark ("Stark"), a white male.

25.  In or around July 2024, a black maintenance employee (name unknown) ("John Doe") submitted a request for time off to Plaintiff.

26.  Plaintiff approved the time off per standard policies.

27.  Shortly after Plaintiff approved John Doe's time off, Stark submitted a request for the identical dates.

28.  Plaintiff denied Stark's request: he was three months behind on his assigned work and his absence would leave the entire region without any maintenance coverage whatsoever.

29.  The maintenance supervisor then made repeated efforts to pressure Plaintiff into reversing her decision as to Stark, including suggesting that under a seniority analysis, John Doe's approved time should be revoked in Stark's favor. Plaintiff refused.

30.  Stark then went directly to Tarrant.

31.     Tarrant overrode Plaintiff's denial, authorizing Stark to take one of the two requested days off.

32.     In doing so, Tarrant required Plaintiff to personally field all maintenance emergency calls during the coverage gap created by Tarrant's unilateral decision.

33.     When the approved day arrived, Stark took it.

34.     The following day, Stark did not report to work and provided no call and no notice whatsoever.

35.     Plaintiff notified Gardner. Defendant took no action whatsoever.

36.     Plaintiff's service coordinator was left to cover building cleaning duties while Plaintiff continued to handle maintenance emergency calls.

37.     Following Stark's no-call, no-show, Plaintiff sent an email to Tarrant, copying Gardner, Defendant's Chief Executive Officer, and Defendant's Human Resources department.

38.     In that email, Plaintiff detailed that Stark had been three months behind on his assigned work, that she had properly denied his time-off request consistent with company policy, and that Tarrant had nonetheless gone around her and approved his absence.

39.     Plaintiff asked, directly, for an explanation of why EHDOC policy had been broken on Stark's behalf. Tarrant never responded.

40.     Gardner called Plaintiff and asked: "*Did you have to put everybody on it?*"

41.     It is believed and therefore averred, Gardner was referring to Plaintiff's decision to copy the CEO and Human Resources on her email.

42.     Plaintiff responded that she expected Tarrant to answer for her conduct, and that the only way that would occur was if the appropriate people were on notice. No substantive response was ever provided.

43. Within a mere matter of days of that email, Gardner sent Plaintiff a text message asking whether she would be in the office on Monday.

44. On August 26, 2024, Gardner arrived and told Plaintiff: "*I didn't wanna do this. I was told I had to. Tarrant told me to come down here and fire you.*" Gardner provided no termination letter and no stated reason.

45. When Plaintiff pressed for a reason, Gardner stated only that Tarrant had reviewed security footage and believed Plaintiff had left one of her buildings and not returned. When Plaintiff asked for the specific date on which this allegedly occurred, Gardner could not identify one.

46. Defendant's position evolved further in response to the Charge of Discrimination Plaintiff filed with the EEOC.

47. Defendant eventually claimed that on a particular day, Plaintiff had clocked out of her first building and clocked into her second building within five minutes of each other, and that because those buildings were five miles apart, this was evidence that she had falsified her time records and stolen company time.

48. The claim was false, and demonstrably so. Defendant's own timekeeping system requires employees to clock out of one site upon arriving at the next, not upon departing. Because Plaintiff was compensated for her travel time between her two Pittsburgh buildings, the protocol was to remain clocked into the first site while traveling and to clock out of the first site at the moment of arrival at the second site.

49. The back-to-back clock entries Defendant described were precisely the entries that its own pay policy required. The accusation was not merely wrong; it was impossible to sustain on Defendant's own terms.

50.    Critically, the date Defendant identified was the same day Plaintiff had reported Stark's unauthorized absence to Gardner.

51.    Defendant did not open a "camera review" of Plaintiff until the day she demanded accountability for the treatment of her black employees.

52.    From the time Plaintiff began objecting to the disparate treatment of her black employees and demanded that Tarrant answer for approving Stark's time off in violation of company policy, Plaintiff was retaliated against for clear reasons of racial bias.

53.    The pretextual basis offered for the termination, a time-entry practice that was not only authorized but required by Defendant's own pay policy, is the clearest possible evidence of fabrication.

54.    Defendant manufactured a reason because the real reason could not be spoken aloud.

## COUNT I
### RACE DISCRIMINATION IN VIOLATION OF TITLE VII
### 42 U.S.C. § 2000e, *et seq.*

55.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

56.    Title VII prohibits an employer from discharging or otherwise discriminating against any individual with respect to the compensation, terms, conditions, or privileges of employment because of such individual's race. 42 U.S.C. § 2000e, *et seq.*

57.    To establish a *prima facie* case of race discrimination, a plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as more favorable treatment of

similarly situated individuals outside her protected class. See: *Moye v. Verland Found.*, Civil Action No. 2:21-cv-646, 2022 U.S. Dist. LEXIS 156750, at \*12 (W.D. Pa. July 26, 2022).

**A.    Plaintiff is a Member of a Protected Class.**

58.    Plaintiff is an black female and is therefore a member of a protected class under Title VII.

**B.    Plaintiff Was Qualified to Perform the Essential Duties of Her Position.**

59.    At all times material, Plaintiff was qualified to perform the essential duties of her Position as a Property Manager.

60.    Plaintiff's record during her nearly two years with Defendant was exemplary. She received consistently positive performance reviews, including a formal review conducted in 2023.

61.    Plaintiff never received any disciplinary action during the entirety of her employment and routinely received praise from Defendant's personnel and the residents she encountered.

**C.    Plaintiff Suffered an Adverse Employment Action.**

62.    An "adverse employment action" is an action taken by an employer which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 765 (3d Cir. 2004).

63.    On August 26, 2024, Defendant terminated Plaintiff's employment. The termination of Plaintiff's employment constitutes an adverse employment action.

**D.    The Adverse Employment Action Occurred Under Circumstances Giving Rise to an Inference of Race Discrimination.**

64.    Throughout Plaintiff's employment, Tarrant applied Defendant's company policies and job requirements selectively, holding African American employees to the full weight of Defendant's rules and job demands while granting Caucasian employees carve-outs and exceptions

9

that were never extended to their African American counterparts.

65.     Tarrant exempted a Caucasian service coordinator, Jennifer, from a corporate-wide directive requiring all sites to participate in the Flag Day/Juneteenth ceremony, while Plaintiff's African American service coordinator was afforded no such exemption.

66.     When Plaintiff properly denied Stark, a Caucasian maintenance employee, a time-off request consistent with company policy, Tarrant overrode Plaintiff's decision and authorized Stark's absence, then permitted Stark to take an additional unauthorized day off without any consequence.

67.     By contrast, when Plaintiff approved a black maintenance employee's time-off request, the maintenance supervisor pressured Plaintiff to revoke that approval in caucasian Stark's favor.

68.     The reason Defendant ultimately offered for Plaintiff's termination, a purported falsification of time records, was pretextual. The back-to-back clock entries Defendant described were precisely the entries that its own pay policy required, rendering the accusation impossible to sustain on Defendant's own terms.

69.     Defendant treated Plaintiff, an African American employee, less favorably than similarly situated Caucasian employees, and terminated her employment on a fabricated basis, thereby giving rise to an inference of race discrimination.

70.     As a direct and proximate result of Defendant's discriminatory conduct in violation of Title VII, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment and humiliation, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Ahtaesha Smith, seeks a judgment against Defendant, Elderly Housing Development and Operations Corporation, for willful noncompliance of Title VII and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and continuing interest as calculated by the EEOC; and (vi) any further legal and equitable relief as this Court may deem just and proper.

**COUNT II**
**RETALIATION IN VIOLATION OF TITLE VII**
**42 U.S.C. § 2000e, *et seq.***

71.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

72.     Title VII prohibits an employer from discriminating against an employee because she has opposed a practice made unlawful by Title VII. 42 U.S.C. § 2000e, *et seq.*

73.     To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. See: *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020).

**A.     Plaintiff Engaged in Protected Activity.**

74.     Following Stark's no-call, no-show, Plaintiff sent an email to Tarrant, copying Gardner, Defendant's Chief Executive Officer, and Defendant's Human Resources department, detailing that Tarrant had gone around Plaintiff to approve Stark's absence in violation of company

11

policy and asking, directly, for an explanation of why EHDOC policy had been broken on Stark's behalf.

75.     In objecting to the disparate treatment of her African American employees and demanding that Tarrant answer for approving a Caucasian employee's time off in violation of company policy, Plaintiff opposed conduct she reasonably believed to be unlawful race discrimination.

76.     Plaintiff's opposition constitutes protected activity under Title VII.

**B.     Plaintiff Suffered an Adverse Employment Action.**

77.     On August 26, 2024, Defendant terminated Plaintiff's employment. The termination of Plaintiff's employment constitutes an adverse employment action.

**C.     A Causal Connection Exists Between Plaintiff's Protected Activity and Her Termination.**

78.     Within a mere matter of days of Plaintiff's email demanding accountability, Gardner sent Plaintiff a text message asking whether she would be in the office on Monday, and thereafter arrived and terminated Plaintiff, stating: "*I didn't wanna do this. I was told I had to. Tarrant told me to come down here and fire you.*"

79.     The temporal proximity between Plaintiff's protected activity and her termination gives rise to an inference of causation.

80.     Defendant did not open a "camera review" of Plaintiff until the day she demanded accountability for the treatment of her African American employees, and the date Defendant identified as the basis for its purported investigation was the same day Plaintiff had reported Stark's unauthorized absence to Gardner.

81.     The reason Defendant offered for Plaintiff's termination was pretextual. The back-to-back clock entries Defendant described were precisely the entries that its own pay policy

required, rendering the accusation impossible to sustain on Defendant's own terms. Defendant manufactured a reason because the real reason could not be spoken aloud.

82. As a direct and proximate result of Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment and humiliation, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Ahtaesha Smith, seeks a judgment against Defendant, Elderly Housing Development and Operations Corporation, for willful noncompliance of Title VII and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and continuing interest as calculated by the EEOC; and (vi) any further legal and equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

83. Plaintiff requests a trial by jury on all matters so triable.

13

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date:  July 27, 2026

By:   */s/ Andrew M. Snyder*
Andrew M. Snyder, Esq. (Pa. I.D. No. 320004)
*/s/ Brendan K. Petrick*
Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
*/s/ Patrick W. Carothers*
Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)

The Workers' Rights Law Group, LLP
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220
Telephone: 412.910.9592
Facsimile: 412.910.7510
andrew@workersrightslawgroup.com
brendan@workersrightslawgroup.com
patrick@workersrightslawgroup.com

*Counsel for Plaintiff, Ahtaesha Smith*

14